AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

```
LODGED
CLERK, U.S. DISTRICT COURT
05/24/2021
CENTRAL DISTRICT OF CALIFORNIA
BY:    DM        DEPUTY
```

# UNITED STATES DISTRICT COURT

for the

Central District of California

```
FILED
CLERK, U.S. DISTRICT COURT
MAY 2 4 2021
CENTRAL DISTRICT OF CALIFORNIA
BY         Cd         DEPUTY
```

United States of America

v.

PETROS HANNESYAN,

Defendant.

Case No. 2:21-mj-02562

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or around March 2020 and continuing until at least in or around June 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Count 1: 18 U.S.C. § 641 | Theft of Government Property |
| Counts 2-3: 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Attested to by applicant in accordance with the requirements of Fed R. Crim. P. 4.1 by telephone

_____
*Complainant's signature*

Mark Coleman, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    May 24, 2021

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

Trial Attorney: Alexis D. Gregorian

## **AFFIDAVIT**

I, Mark Coleman, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for over 24 years.   I am assigned to the FBI's Los Angeles Field Office, working on a squad that investigates violations of federal health care laws.   I have received training from the FBI and other public and private organizations in the investigation of a wide variety of financial fraud schemes, including health care fraud, wire fraud, mail fraud, money laundering, and other illegal financial transactions.   I have been the lead investigator on a wide variety of health care fraud investigations, including investigations that resulted in charges related to theft of government funds and wire fraud.

### II.   **PURPOSE OF AFFIDAVIT**

2.   This affidavit is made in support of a criminal complaint against, ~~and arrest warrant for,~~ PETROS HANNESYAN ("HANNESYAN") for violations of 18 U.S.C. § 641 (Theft of Government Property) and 18 U.S.C. § 1343 (Wire Fraud).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of

or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Summary of Probable Cause**

4.    As set forth in more detail below, from in or around March 2020 until in or around June 2020, HANNESYAN submitted false and fraudulent loan applications and loan agreements to the Small Business Administration ("SBA") and false and fraudulent provider relief attestations to the United States Department of Health and Human Services ("HHS") in order to obtain loans and maintain a payment under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  HANNESYAN then converted these fraudulently obtained and maintained CARES Act funds to his own use, rather than use them to meet financial obligations and operating expenses of his purported businesses, Hollywood Home Health Services, Inc. ("Hollywood") and sole proprietorship Petros Hannesyan ("PH"), as required by the SBA, or to provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19, as required by HHS.

**B.    Background**

<u>The CARES Act Provider Relief Fund</u>

5.    The CARES Act was a federal law enacted in or around March 2020 and designed to provide emergency assistance to the millions of Americans suffering due to the COVID-19 pandemic. The CARES Act appropriated moneys to help health care providers ("Providers") that were financially impacted by COVID-19, as

2

well as to provide care to patients who were suffering from COVID-19 and compensate providers for the cost of that care (hereinafter, the "Provider Relief Fund"). HHS, through its agency, the Health Resources and Services Administration ("HRSA"), oversaw and administered the Provider Relief Fund.

6. In order to rapidly provide funding to Providers during the pandemic, HRSA distributed payments under the CARES Act Provider Relief Fund ("Provider Relief Fund Payment" or "Payment") to Providers who (a) billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019; (b) provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of the coronavirus; (c) were not currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; (d) were not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and (e) did not currently have Medicare billing privileges revoked. Providers meeting these criteria automatically received the Provider Relief Fund Payment and did not have to apply for the funding, but were required to comply with the terms and conditions of the Provider Relief Fund if they retained such funding.

7. Provider Relief Fund recipients attested to their compliance to the terms and conditions in two ways. First, Provider Relief Fund recipients were notified that they could submit an attestation through an online portal confirming receipt of the funds and agreeing to the terms and conditions of

3

the payment ("Terms and Conditions").  Second, recipients were notified that if they kept the money for a period that exceeded 90 days from receipt that they were deemed to have accepted the Terms and Conditions of the Provider Relief Fund.

8.    Providers who attested to the Terms and Conditions acknowledged that their commitment to full compliance with the Terms and Conditions was material to the HHS Secretary's decision to disburse Provider Relief Fund Payments to them. Providers further acknowledged that non-compliance with any Term or Condition could cause the HHS Secretary to recoup some or all of the Payment.

9.    Providers who attested to the Terms and Conditions certified that after January 31, 2020, they provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19.

10.    Providers who attested to the Terms and Conditions also certified that the Payment would only be used to prevent, prepare for, and respond to coronavirus, and that the Payment would reimburse the recipient only for health care related expenses or lost revenues that were attributable to coronavirus.

11.    Providers who attested to the Terms and Conditions also certified that all information provided relating to the Payment was true, accurate, and complete and that any deliberate omission, misrepresentation, or falsification of any information was punishable by, inter alia, criminal penalties, including but not limited to imprisonment.

12.   Providers who attested to the Terms and Conditions also certified that they would maintain appropriate records and cost documentation to substantiate the reimbursement of costs under the disbursement.

### The Economic Injury Disaster Loan Program

13.   The EIDL program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

14.   The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL loan.  The amount of the advance was determined by the number of employees the applicant listed and certified having.  The advances did not have to be repaid.

15.   To obtain an EIDL loan and advance, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020.  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

5

16.   EIDL loan applications were submitted directly to the SBA.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold, as described above.  Any funds issued under an EIDL loan or advance were issued directly by the SBA.

17.   EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

**C.   Relevant Individual, Entities, and Accounts**

18.   Hollywood was a home health agency located at 1253 N. Vine Street #20, Los Angeles, California 90038.  HANNESYAN was the owner and Chief Executive Officer of Hollywood.

19.   HANNESYAN controlled and was a co-signatory with his wife on a business checking account in the name of Hollywood at a financial institution (the "Hollywood Bank Account 1").

20.   HANNESYAN controlled and was a co-signatory with his wife on a business checking account in the name of Hollywood at a financial institution (the "Hollywood Bank Account 2").

21.   HANNESYAN controlled and was a co-signatory with his wife on a personal checking account at a financial institution (the "Personal Checking Account").

22.   HANNESYAN controlled and was a co-signatory with his wife on a personal savings account at a financial institution (the "Personal Savings Account").

23.   Based on my review of California Secretary of State records, I know that Hollywood was incorporated on February 18,

6

2003, and was located at 1253 N. Vine Street, #20, Los Angeles, CA 90038. A Statement of Information filed on September 27, 2018, for Hollywood reflected the same address, and HANNESYAN as chief economic officer ("CEO"), secretary, chief financial officer ("CFO"), and director for the business. The most recent Statement of Information available was filed on April 14, 2020, reflected the same address, and HANNESYAN as the CEO, secretary, CFO, and director of Hollywood.

24. Based on my review of Medicare records held by the Centers for Medicare and Medicaid Services ("CMS"), the HHS agency responsible for administering Medicare, CMS contractors, and discussions with other agents, I know the following:

a. A Medicare provider enrollment application (CMS-Form 855A) was submitted for Hollywood on or about June 4, 2003. On or about May 4, 2017, according to a signed and notarized Contract for Purchase of Stock issued by Hollywood, HANNESYAN purchased 100% of Hollywood's issued stock. On or about May 9, 2017, HANNESYAN signed a CMS-Form 855A Change of Information that established HANNESYAN as the president, CEO, CFO, and secretary of Hollywood. On or about May 9, 2017, HANNESYAN signed an Electronic Funds Transfer ("EFT") Authorization Agreement for Medicare payments to be electronically deposited into Hollywood Bank Account 1.

b. In 2019, Hollywood submitted claims to Medicare for approximately $525,247 and was paid approximately $749,432 on those claims. The claims were for dates of service allegedly

7

provided to Medicare patients by Hollywood between January 2, 2019, and August 20, 2019.

**D.   Cessation of Hollywood's Operations in 2019**

25.   Based on my review of financial documents, CMS records, and interviews of former Hollywood employees, on or about June 20, 2019, Hollywood stopped receiving payments from Medicare and ceased operating its business approximately two months later, and before January 31, 2020:

a.   On or about June 20, 2019, CMS suspended Medicare payments to Hollywood based on credible allegations of fraudulent billing.[1]

b.   Accordingly, CMS stopped issuing payments to Hollywood Bank Account 1 on or about June 26, 2019.

c.   Medicare claims data demonstrates that the last date of service on which Hollywood clinical staff purportedly provided care to a Medicare beneficiary was August 20, 2019.

d.   State of California Employment Development Department ("EDD") payment records show that Hollywood stopped paying and reporting quarterly tax contributions on behalf of its employees to EDD as of the fourth quarter of 2019.  EDD reported that Hollywood did not issue quarterly tax contributions from either the fourth quarter of 2019 or the first and second quarters of 2020.

---

[1] Hollywood continued to submit claims to Medicare for services allegedly provided to patients through August 20, 2019, but did not receive payment on those claims.

e.     On September 22, 2020, former Hollywood employee 1 ("FE-1") was interviewed.  FE-1 reported that FE-1 worked at Hollywood for approximately three years, from 2016 until 2019, as a traveling nurse.  FE-1 was responsible for providing medical care to Hollywood patients at their homes.  According to FE-1, Hollywood shut down suddenly in the third quarter of 2019, and did not inform FE-1 why the company was shutting down.

f.     On November 5, 2020, former Hollywood employee 2 ("FE-2") was interviewed.  FE-2 explained that FE-2 worked at Hollywood for two or three years, from approximately 2017 or 2018 until the end of 2019.  FE-2 worked as a field nurse and was responsible for visiting Hollywood patients' homes and providing medical care and education.  According to FE-2, Hollywood closed suddenly at the end of 2019 with no explanation; FE-2 stated that one of Hollywood's directors of nursing services informed FE-2 that Hollywood was closing, but did not provide FE-2 any more information.

g.     According to property management records from Sharp Capital Group ("Sharp"), the property owner of Hollywood's business location, HANNESYAN entered into a commercial lease agreement on behalf of Hollywood for office space at 1253 Vine Street, Suite #20, Los Angeles, CA 90038 starting on or about May 9, 2017.  According to records from Sharp, Hollywood last paid rent in February 2020.  As of November 12, 2020, Sharp had received no further payments from HANNESYAN, despite repeated requests.

**E.    HRSA Attestations**

26.    As discussed above, Medicare providers that attested to the receipt of Provider Relief Fund payments confirmed that they complied with the terms and conditions of those payments. One of the conditions was that the provider provided diagnoses, testing, or care for individuals with possible or actual cases of the coronavirus after January 31, 2020.  Based on my review of HRSA documents and records, I know that HRSA received attestations from Hollywood on April 18, 2020, and May 4, 2020, which contained the following information:

a.    HANNESYAN was listed as the attesting individual associated with Hollywood's employer identification number ("EIN") of 65-1174156.

b.    Hollywood's attesting individual utilized an IP address 71.95.216.60 to complete HRSA's online attestation process.  This IP address was leased by a business in the name of HANNESYAN's wife.

27.    On April 17, 2020, HRSA deposited $70,554.74 into Hollywood Bank Account 1.  Following the receipt of that payment, a series of transfers occurred that removed the $70,000 of the Provider Relief Fund payment from Hollywood Bank Account 1, including:

a.    On April 17, 2020, $65,000 was transferred to the Personal Checking Account.

b.    On April 17, 2020, $1,000 was transferred to Hollywood Bank Account 2.

10

28.   On April 27, 2021, HANNESYAN was interviewed by federal agents and confirmed that he owned and operated Hollywood, and that he completed the online attestation for the Provider Relief Funds, although he claimed that he did not read the terms and conditions when he submitted the attestation.

**F.    EIDL Applications and Loan Agreement**

29.   As discussed above, EIDL loans and advances were issued based on receipt and favorable dispensation of applications submitted directly to the SBA.  From my review of SBA EIDL records and documents, I know that HANNESYAN submitted at least six applications on behalf of three distinct businesses from March 2020 until September 2020.  HANNESYAN received advances or full loan payments on three of these applications, including the following two applications:

<u>Hollywood EIDL Application and Loan Agreement</u>

30.   On March 31, 2020, HANNESYAN submitted an application for Hollywood.  In this document, HANNESYAN indicated that he was the CEO and owner of HOLLYWOOD and employed zero employees as of January 31, 2020.  The SBA approved an advance and issued $1,000 to Hollywood Bank Account 2 on April 21, 2020.  On May 25, 2020, HANNESYAN signed and submitted a loan authorization and agreement to the SBA on behalf of Hollywood.  That loan authorization and agreement provided under "Use of Loan Proceeds," that "Borrower [Hollywood] will use all the proceeds from the Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter . . . ."  Based on this

11

representation, the SBA then transferred the balance of the EIDL loan payment in the amount of approximately $149,900 via interstate wire to the Hollywood Bank Account 2 on May 27, 2020.

### PH Loan Application

31.   On June 9, 2020, HANNESYAN submitted an application for PH, a sole proprietorship.  In this document, HANNESYAN indicated that he was the owner of PH, that the EIN for PH was the same as HANNESYAN's personal social security number ("SSN"), that PH's business activity was "Agriculture," that PH had $830,000 in gross revenues for the twelve months prior to the disaster, and that PH employed nine employees as of January 31, 2020.  Based on these representations, the SBA approved an advance and transferred $9,000 via interstate wire to the Personal Checking Account on June 11, 2020.  The SBA subsequently requested financial documents from PH to verify the company's submitted financial information and tax status but did not receive any correspondence from HANNESYAN or a representative of PH.  The SBA then declined the application and notified PH of the declination in a letter dated June 18, 2020.

32.   Based on my training and experience, I believe these statements about the existence of a sole proprietorship called PH, the number of employees, the business activity, and the gross revenue generated were false statements designed to obtain an advance and/or EIDL loan from the SBA.

a.   According to U.S. Internal Revenue Service ("IRS") and California employment regulations, sole proprietorships are required to register a separate EIN from the

12

SSN of the sole proprietor if they retain one or more employees. Otherwise, the sole proprietor can reorganize into a different business organization such as a corporation to hire one or more employees.  California Secretary of State website queries do not reveal any corporations, limited liability companies, or limited partnerships with the name "Petros Hannesyan."  In my training and experience, it is unusual for a sole proprietorship with nine employees to legally operate at an address in California and legally report taxes to government agencies while using the same EIN as the sole proprietor's SSN.

    b.    HANNESYAN submitted three different EIDL loan applications for sole proprietorship PH, with each application claiming a different number of employees, different business activities (e.g., Agriculture, Business Services), and different gross revenues for the year prior to January 31, 2020.

    33.  Following the receipt of the EIDL loan advances and full payment on the EIDL loan for Hollywood, the EIDL payments for Hollywood and PH were transferred directly to personal accounts controlled by HANNESYAN:

    a.    As discussed above, the EIDL advance payment of $9,000 was deposited directly to the Personal Checking Account on June 11, 2020.

    b.    On June 8, 2020, $149,000 was transferred from HOLLYWOOD Bank Account 2 into the Personal Savings Account.

**G.    HANNESYAN's Use of CARES Act Funds**

    34.  As discussed above, once the Provider Relief Fund and EIDL payments were transferred to the Personal Checking Account

and the Personal Savings Account, the funds were used for purchases and payments unrelated to the COVID-19 disaster relief purposes for which they were issued:

a.   On April 23, 2020, a $29,355 international money wire that HANNESYAN and his wife originated from the Personal Checking Account was sent to an individual and deposited to a bank in Yerevan, Armenia, and had a memo description that read "Family support."  In my training and experience, sending an international wire for family support to a foreign recipient does not constitute a health care related expense used to prevent, prepare for, and respond to the coronavirus as described in Hollywood's HRSA attestation.

b.   On June 26, 2020, a $57,500 cashier's check was purchased by HANNESYAN's wife and remitted from the Personal Savings Account to another individual, with a memo line that read "Full & Final Payment Purchase Pulse Health."  From my review of California Secretary of State records as of March 11, 2021, I know that Pulse Health Facility, Inc. is a congregate living facility in Sunland, CA.  In my training and experience, the purchase of an unrelated facility is not "use as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter" by Hollywood, as HANNESYAN represented in the EIDL loan agreement for Hollywood.

c.   On June 29, 2020, HANNESYAN's wife issued a $15,450 check to Pulse Investment LLC from the Personal Checking Account, with a memo line that read "Rent/Security Deposit +

14

Insurance." In my training and experience, investment in an unrelated facility does not constitute an appropriate use of proceeds, such as payroll expenses, sick leave, production costs, and business obligations of purported sole proprietorship PH as required under the EIDL program.

35.    Based on the above information, there is probable cause to believe that:

[18 U.S.C. § 641]

a.    Beginning on or about April 17, 2020, and continuing through on or about May 4, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant PETROS HANNESYAN, did knowingly and willfully steal, purloin, and convert to his own use and the use of another money, of a value exceeding $1,000, of the United States and the departments and agencies thereof, that is, approximately $70,554.74 from the HHS Provider Relief Fund.

[18 U.S.C. § 1343]

b.    Beginning on or about March 31, 2020, and continuing through on or about May 27, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant PETROS HANNESYAN knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud the SBA as to material matters, and to obtain moneys, funds, assets, and other property owned by and in the custody and control of the SBA by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

15

c.   For the purpose of executing the above-described scheme to defraud, HANNESYAN transmitted and caused the transmission of the following items by means of wire communication in interstate commerce: (i) a transfer of approximately $149,900 in EIDL loan proceeds from the SBA, sent by means of an interstate wire, into the Hollywood Bank Account 2 on or about May 27, 2020; and (ii) a transfer of approximately $9,000 in EIDL loan advance proceeds from the SBA, sent by means of an interstate wire, into the Personal Checking Account on or about June 11, 2020.

### IV.   CONCLUSION

36.   Based on the foregoing, there is probable cause to believe that HANNESYAN violated 18 U.S.C. § 641 (Theft of Government Property) and 18 U.S.C. § 1343 (Wire Fraud).

Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on May 24,
2021.

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE